A rehearing was granted because a majority of the present members of the court have grave doubt as to the soundness of the reasons given for the conclusion originally reached. After considering again all of the facts and legal questions presented by those facts, we now conclude that the decree originally rendered was correct, for reasons which we shall now set forth.
Wiley Mossy engaged in business as Mossy Motors and as such, dealing in automobiles, entered into a contract with Miss Bessie McRedmond for the purchase by her of a new Oldsmobile automobile together with certain special tires and accessories. The price agreed upon was $1,405, and in part payment of this price Mossy agreed to allow Miss McRedmond $600 for her used Chevrolet. The Oldsmobile tires and accessories were selected, the price and all terms and conditions were agreed upon and Miss McRedmond executed a note for the balance of the price, and a chattel mortgage to secure it, and asked Mossy to have the car greased and otherwise "serviced" for delivery. Mossy advised Miss McRedmond that this would be done and that she could return at a stipulated time later that afternoon for delivery of the car.
This was satisfactory to her. However she did not return for the car, but instead advised Mossy that another dealer, Pontchartrain Motor Company, had offered her a better "trade-in" price for her Chevrolet and that, therefore, she had bought another Oldsmobile from that dealer instead of accepting delivery of the one she had purchased from Mossy. *Page 720 
A short time thereafter Mossy sold to another customer the automobile which Miss McRedmond had agreed to buy, obtaining for it the same price, $1,405, which she had agreed to pay.
Mossy brought this suit against defendant for $383.58 alleging that to be the profit he would have made on the transaction had it been consummated by acceptance of the car and payment of the purchase price.
By exceptions, defendant raised the contention that since Mossy subsequently sold the same automobile and accessories to another purchaser for the same price, he sustained no loss and therefore has no cause of action against Miss McRedmond.
While Mossy's testimony is not entirely clear on the subject we may assume that the record shows that at that time he would have been able to obtain from the manufacturers an unlimited supply of Oldsmobile cars, or at least as many as he could sell and that therefore he would have made one more sale had defendant accepted the Oldsmobile which she contracted for. Mossy says that he could have delivered that car and could also have delivered cars to all persons who afterwards bought from him, and that therefore he was actually deprived of a sale by the refusal of defendant to complete her trade by accepting delivery.
As we have already said, a majority of the members of the court believe that there is grave doubt as to the soundness of the original conclusion of the majority of the court as it was then constituted, that plaintiff failed to prove the extent of his loss of profit.
We think that before we can properly take up for consideration the question of whether the plaintiff has proven the extent of his loss, we must first determine whether, by reselling the same car to someone else and for a price as great as that which defendant agreed to pay, he has deprived himself of the right to recover at all. When we first considered this case, we did not feel called upon to investigate the legal effect of the fact that Mossy resold the same car to a new buyer and for the same price, and we merely said that if he had had a limited supply of cars and had sold all that the manufacturer would ship to him, he had sustained no loss, but that since he believed that if Miss McRedmond had gone forward with her purchase he would have made one more sale than he did make, she, by her breach of her contract, had caused him damage to the extent of the profit he would have made on that sale.
We now have given thought to this question of the legal effect of the resale by the vendor of an article which the vendee has bought but of which he fails to accept delivery. Our courts, on several occasions, have considered this question and, as stated by Mr. Samuel J. Goodman in an article entitled "The Right of the Vendor to a Resale After Title has Passed", 4 Tulane Law Review 92:
"The Louisiana courts have often stated that when the vendee has breached the contract of sale by a refusal or failure to accept delivery of the goods, the vendor has the right to resell the property to a third party, and sue for the difference between the price obtained on resale and the contract price."
And our courts have gone beyond this and have said that the vendor, having the right to resell the article, must do so at the market price and may not claim to have been damaged by the breach of contract if the price at which the resale is made or could be made is as great as was the price agreed upon in the original contract of sale. This latter rule is recognized in Mutual Rice Co. v. Star Bottling Works, 163 La. 159, 111 So. 661, 663. What was said in that case on the subject of the duty to resell at the market price may not have been necessary to a decision of the case for the court, before discussing what would have been the obligation of the vendor to minimize the loss, had there been a breach of contract by the vendor, said that "the negotiations * * * had not become a completed contract." Thus the case was decided, not on the ground that had there been a breach the vendor should have minimized his loss, but rather on the ground that there never had come into existence a contract and, that obviously therefore, there could not have been a breach. This very statement very forcibly directs our attention to the distinction between that case and this, for here there can be no doubt that all negotiations had been completed and that the actual sale had been made. Nothing remained but delivery and payment. The article had been selected and the price had been agreed upon. Thus the sale was a complete one and the title to the car had actually passed to the purchaser.
"Contract of sale — When complete. — The sale is considered to be perfect between the parties, and the property is of *Page 721 
right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid." C.C. Art. 2456.
Since the sale was complete and since title had actually passed, obviously it could not be dissolved by one of the parties. Even in the event of failure of the vendee to pay the price, the vendor cannot treat the sale as dissolved but can only sue to dissolve it. C.C. Art. 2561. And for any other breach, a dissolution, if desired by one of the parties, may be claimed only by suit. C.C. Art. 2046, 2047. And as evidencing the obvious fact that our Code contemplates that where the thing has been selected and the price and the terms have been agreed upon, title passes to the vendee, we point to Articles 2555 and 2556, the former of which makes the vendee liable to the vendor for expenses incurred in "the preservation of the thing", and the latter of which authorizes the vendor, on certain conditions, to put the movables sold "out of his house at the risk of the purchaser."
Nowhere in our Code is there to be found any article, express or by fair implication, authorizing the vendor, where the vendee breaks the contract, to resell the already sold article and to use its resale as a vehicle for relieving the original vendee of liability for the breach of the contract. Articles 2555 and 2565 are sometimes cited as possibly giving to the vendor this right. See H.T. Cottam Co. v. Moises, 149 La. 305, 88 So. 916, but these articles do not in any way provide that there may be a resale where title has passed and there are other articles to which we have referred which we think indicate that no such right was intended to be given to the vendor. It is true that Article 2555 does make the purchaser "who neglects to obtain delivery of the things sold * * * answerable to the vendor for the damage which he may sustain on that account * * *", but the context of the article indicates that the damage contemplated is that suffered as a result of the obligations which in such cases are placed upon the vendor by Articles 2468 and 2469.
It is also true that Article 2565 provides that
"Delay in payment of price — Damage resulting — Liability. — If, on account of delay in the payment of the price, the seller is obliged to retain or to resume the thing sold, and its value is diminished, the buyer is bound to make good this diminution to the amount of the price which had been agreed upon."
But clearly this article fixes the measure of damage only when the sale has been dissolved by suit because under Articles 2046 and 2047 a dissolution may be obtained only as a result of suit.
Article 2046 provides for the dissolution of the contract for certain causes but it also provides that "in this case the contract is not dissolved of right; * * *", and that if the party who complains of the breach wishes to do so, he may sue for its dissolution "with damages", or he may demand specific performance. And Article 2047 clearly requires litigation if dissolution is desired.
The rule that where there can be a resale at the same price, there can be no recovery for the original breach is, no doubt, in many instances a fair one and in many others very unfair. Where it is applied in the case of a single article it may produce a fair result, but if applied in the case of a merchant which is regularly engaged in selling similar things, and where there is an unlimited supply and a limited market, surely it is easy to see that an unfair result would often be reached by its application. Let us illustrate by the facts presented here. A is an automobile dealer with an unlimited supply of cars. B agrees to buy a car exactly like many other cars which A has for sale. The contract is completed except for delivery and payment. B notifies A that he has decided to breach the contract. C, another prospective purchaser, comes into A's establishment and wishes to purchase a car exactly like the one A sold to B.
If the already referred to rule is sound, A, to minimize his loss, must sell that car to C, but if C buys it at the same price, then A has sustained no loss. We ask, why not; has he not lost the opportunity of making a profit on the sale made to C? It is true that he has thus minimized a loss, but it is not his loss but B's which he has minimized and he has done so by sacrificing a profit which he would have made on another sale. We do not see why he should be called upon to do so. It is perfectly fair to apply that rule in the case of real estate or of some special object of which there is only one or of which there is a limited supply for, of course, if A has only *Page 722 
one house and B agrees to buy it for $10,000, if B breaches the contract and A has no other similar house and sells the same one to someone else for $10,000, he has sustained no loss. But even in that case there is no Codal or statutory authority in this State for this rule. And it would also be fair to apply the rule in the case of commodities sold on the regular exchanges or markets or of stocks and bonds and other securities for which there is an unlimited market, for the very fact that there is a regular market or exchange indicates that such commodities or securities may always be sold and that therefore by the resale the supply of potential customers is not being exhausted or depleted. In such cases the effect of the resale is not to exhaust the market but only to affect the price.
Mutual Rice Co. v. Star Bottling Works, supra, may therefore be distinguished on two grounds. (First) The sugar was sold by the manufacturer whose supply was limited to what it had itself produced, and (Second) The thing sold was a commodity which could readily have been disposed of on the open market through a regular exchange.
If a person, who himself produces a commodity, sells it all, he sustains no loss if he is required to resell to a new purchaser what a former purchaser has refused to accept. But if a merchant, who buys merchandise for resale and whose supply is thus unlimited, must exhaust his customers by reselling what has already been sold to other customers, he clearly sustains damage.
We do not mean to say that the rule requiring a resale has been expressed only in Mutual Rice Co. v. Star Bottling Works, supra, in fact in that case seven others are cited. They are: Bartley v. City of New Orleans, 30 La.Ann. 264; Jochams v. Ong, 45 La.Ann. 1289, 14 So. 247; Robinson Lumber Co. v. W.O. C.G. Burton,128 La. 120, 54 So. 582; Bonsor Co. v. Simon Rice Milling Co.,151 La. 1094, 92 So. 711; National Wholesale Grocery Co. v. Simon Rice Milling Co., 152 La. 1, 92 So. 713; Garrison Son v. Sherill Hardwood Lumber Co., 156 La. 147, 100 So. 253; Wertham Bag Co. v. Roanoke Mercantile Co., 157 La. 312, 102 So. 412; Burglass v. J.C. Healy Co., 159 La. 393, 105 So. 384; 24 R.C.L. 109 and 112. And in H.T. Cottam Co. v. Moises, supra, the Supreme Court, without stating that in such situation the vendor must resell the article, said that he has the right to do so.
"`The rule of law is that, when a vendee refuses to accept delivery of the goods and pay the price, the vendor, after reasonable notice to vendee, may resell the goods to best advantage, at auction or at private sale, and hold the vendee for the difference in price.' * * *" [149 La. 305, 88 So. 917].
In that case the court cited twelve cases as supporting that view. Many of the cases cited in the Mutual Rice Company case and in the Cottam case did not involve breaches by the buyer; in fact, most of them resulted from the failure of the vendor to deliver, and we readily recognize the fairness of applying the market value rule to fix the extent of the loss of the purchaser where the vendor fails to deliver.
If A agrees to sell a carload of sugar to B and fails to deliver it, B's loss is the difference between the price he would have paid to A and the price which he must pay in the open market. But we think that we have clearly shown that there is no equity in applying the rule the other way around where the breach is by the vendee and the vendor has an unlimited supply. And we also recognize the fairness of the rule if applied in the case of a breach by the vendee where there is an unlimited market and the commodity sold may be readily disposed of.
We think that the rule recognized in those cases to which we have referred has descended illegitimately from the original holding in Gilly v. Henry, 8 Mart., O.S., 402, 13 Am.Dec. 291, which was decided in 1820, and in which it was apparently announced for the first time.
As is shown by Mr. Goodman in his cited article, 4 Tulane Law Review 92, when that case (Gilly v. Henry) was decided, the Spanish law had considerable influence in Louisiana. This was because the statute adopting our Code of 1808, in effect, provided that the Spanish law — under which from 1768 to 1803, Louisiana had been governed — should continue to prevail except where abrogated by the said Code. See Introduction to Saunders Revised Civil Code of La. 2nd Ed., 1920. And in the Gilly case not only was our own Code not cited but "Las Siete Partidas" was cited and it was shown that therein the vendor was specifically given the right to resell and to sue for the difference in price. Nowhere in our Code is there any such provision. And that it was "ex industria" omitted from our Code is, we think, evidenced *Page 723 
by the fact that although the French law, Article 1657, grants this right in the case of movables, our Code — which, as is well known, is derived from and patterned after the Code Napoleon — contains, as we have already said, no such provision.
We, therefore, respectfully express the opinion that though the case of Gilly v. Henry, supra, was properly decided because it was based on the Spanish Law then in force to some extent in Louisiana, its effect should not have been extended beyond the time when in 1828, Act No. 83 specifically abrogated all of the "civil laws" then in force because our Supreme Court held in Executors of Lewis v. Casenave, 6 La. 437, and in Handy Under Tutor v. Parkison, 10 La. 92, that the effect of the act of 1828 was to abrogate all that remained of our Spanish Civil Laws.
As a matter of fact, many of the cases pointed to as authorizing the vendor to resell or as requiring the vendor to resell in an effort to minimize the loss may be disposed of, as Mr. Goodman points out in Note 40, Page 101, on the ground that "they contain only dictum on the subject of resale" and many others, as he also shows in Notes 41, 42, 43, 44 and 45, may also be distinguished for other reasons set forth.
Still it cannot be denied that these the statute adopting our Code of 1808, in effect, provided that the Spanish law — under which from 1768 to 1803, Louisiana had been governed — should continue to prevail except where abrogated by the said Code. See Introduction to Saunders Revised Civil Code of La. 2nd Ed., 1920. And in the Gilly case not only was our own Code not cited but "Las Siete Partidas" was cited and it was shown that therein the vendor was specifically given the right to resell and to sue for the difference in price. Nowhere in our Code is there any such provision. And that it was "ex industria" omitted from our Code is, we think, evidenced *Page 723 
by the fact that although the French law, Article 1657, grants this right in the case of movables, our Code — which, as is well known, is derived from and patterned after the Code Napoleon — contains, as we have already said, no such provision.
We, therefore, respectfully express the opinion that though the case of Gilly v. Henry, supra, was properly decided because it was based on the Spanish Law then in force to some extent in Louisiana, its effect should not have been extended beyond the time when in 1828, Act No. 83 specifically abrogated all of the "civil laws" then in force because our Supreme Court held in Executors of Lewis v. Casenave, 6 La. 437, and in Handy Under Tutor v. Parkison, 10 La. 92, that the effect of the act of 1828 was to abrogate all that remained of our Spanish Civil Laws.
As a matter of fact, many of the cases pointed to as authorizing the vendor to resell or as requiring the vendor to resell in an effort to minimize the loss may be disposed of, as Mr. Goodman points out in Note 40, Page 101, on the ground that "they contain only dictum on the subject of resale" and many others, as he also shows in Notes 41, 42, 43, 44 and 45, may also be distinguished for other reasons set forth.
Still it cannot be denied that the rule is recognized and that it is not within our province nor power to do anything which may affect it in any case in which it is properly applicable. And we have no doubt that it is applicable wherever there is involved only a single special article, or at least a limited supply, or an unlimited market. But we are not at all certain that the rule has been or will be applied to a situation such as that found here — so as to require that the merchant who has an unlimited supply must use another sale which he may make to save from loss an earlier customer who, by his own breach, has made himself liable.
If we treat such a sale as was made here as a completed transaction and realize that title had actually passed to Miss McRedmond, then not only was it not the duty of Mossy to resell the automobile but, as a matter of fact, he had no right whatever to do so. If not, then what was the legal effect of the resale by him? We have already shown that a sale may not be abrogated at the will of one of the parties. Therefore, when Miss McRedmond advised Mossy that she had no intention of accepting the car, Mossy had the right to refuse to accept her cancellation and to demand, and, if necessary, to sue for the full purchase price. Or, if he was willing to permit Miss McRedmond to abrogate the contract, he could consent to this; and, in view of what we have already said, it seems to us that when he resold the same car he must be considered as having acquiesced in the demand that the contract be abrogated. If that effect be given to his resale of the car, then obviously he has no right to sue for any loss because he has abandoned his right to demand the full purchase price by acquiescing in the cancellation of the contract of sale.
On the other hand, if there be no distinction between this case and those others cited in which the courts have held that the vendor may claim only the difference between the original contract price and the market price, then plaintiff is in no better position because he has himself shown that between those two prices there was no difference. Thus, whether it be because in reselling the car he evidenced acquiescence in Miss McRedmond's abrogation of the contract, and, therefore, cannot claim damages for its breach, or whether it be because the jurisprudence has established a rule applicable to the facts here, to the effect that where the article is resold at a price equal to or greater than the original contract price, there can be no recovery for the breach of contract, there can be no recovery.
Our original decree is reinstated and made final. The right of plaintiff is reserved to apply for a rehearing.
Original decree reinstated and made final.