## AMERICAN RICE MILLING CO., Inc., v. BALTIC AMERICAN FEED CORPORATION (MARTENIS, Intervener).
### No. 1276.

Court of Appeal of Louisiana. First Circuit.
Jan. 22, 1934.

Pugh & Buatt, of Crowley, for appellant.

E. F. Gayle, of Lake Charles, for appellee Martenis.

MOUTON, Judge.

This case was consolidated for trial with the cases of Kaplan Rice Mill Company, Inc., and Simon Rice Milling Company against the same defendant, the Baltic American Feed Corporation.

Separate opinions and decrees were rendered in each case by the district judge rejecting the demand of the plaintiffs in the three cases.

Counsel for plaintiffs, defendant, and C. J. Martenis, intervener, have each filed one brief for the three cases. Counsel for plaintiffs and appellants says, and most properly, that the record is so confusing that it is hard to find the evidence touching each particular case.

The district judge has, however, gone over the evidence very carefully and has grounded his judgment on the facts which are specifically referred to in the opinions rendered in this case, and in the two other cases, above mentioned.

The contentions of plaintiffs on this appeal, and the two others, are in reference to the facts found by the district judge and not as to the correctness of the rules of law upon which his conclusions are based.

In this case, the opinion of the court is as follows:

"The plaintiff alleged that on March 27, 1931, it sold, through Connell Rice & Commission Company, Inc., broker, 500 bags choice brewers' rice, containing 120,000 pounds, at $1.10 per 100 pounds; that the said rice was delivered 'freight alongside ship' Palatia, on which steamer the rice was shipped June 20, 1931; that the defendant refused to pay for said rice on June 29, 1931, at which time the Palatia was on the high seas, and at which time plaintiff alleged the rice market had dropped to 75 cents per 100 pounds, and plaintiff brought this suit, claiming damages as of June 29, 1931. The defendant being a nonresident, the plaintiff sought jurisdiction by attaching other rice of the defendant.

"The curator ad hoc, appointed to represent the absent defendant, filed a motion to dissolve the writ of attachment on the ground that plaintiff's suit was one for unliquidated damages. This motion was tried and overruled by my colleague, Judge Jerry Cline.

"Later, the plaintiff secured personal service on the defendant, who filed an answer through its own counsel, admitting the contract, but denying liability because the rice was not of the grade contracted for, because it was shipped on the steamer Palatia contrary to defendant's instructions, and because the rice was not delivered 'in accordance with the terms and conditions of its contract.'

"C. J. Martenis, doing business under the name of C. J. Martenis Grain Company, filed a petition of third opposition, claiming the proceeds of the rice attached in this suit by virtue of an assignment to him by the defendant of 'dock receipts' covering the rice attached.

"From document 'A-1,' attached to plaintiff's petition, it appears that on March 27, 1931, the plaintiff, through its broker, Connell Rice & Commission Company, Inc.; sold to the defendant 500 double bags choice brewers' rice, 240 pounds net each, at $1.10 per 100 pounds, net, freight alongside ship. According to this contract, shipment was to be made in April or May, at the buyer's option, and payment was to be made in New York 'upon presentation of documents.'

"The broker, acting for the plaintiff, twice asked the defendant for shipping instructions, May 15, 1931, and May 19, 1931. Connell, a

member of the brokerage firm, testified by deposition that on May 15 the defendant asked verbally that the shipment be delayed as long as possible. (See carbon copy of letter attached to Connell's deposition.) This request for delay in shipment was canceled by defendant's letter of May 19. (P–10.)

"On May 19, 1932, and within the time required by the contract, the defendant wrote the broker to have the plaintiff ship the rice covered by the contract on the North German Lloyd steamer Palatia, and that the plaintiff was to draw on the purchaser, through the Bank of America, N. Y., ocean bills of lading and other necessary papers attached. (P–10.)

"On May 20, 1931, the broker, relaying defendant's instructions, wrote the plaintiff that the rice was to be delivered 'alongside North German Lloyd's steamer "Palatia,"' which meant simply that the rice was to be stored in the dock warehouse opposite the pier at which the steamer was scheduled to dock. This letter, differing from that written on May 19 by defendant to the broker, and giving defendant's shipping instructions, did not say the rice was to be shipped on the Palatia.

"Fieudenthal, for defendant, testified he was not certain he wished to ship on the Palatia, but was certain he intended to ship on the North German Lloyd Line. (Tr. 96.) Whether he told the broker, after the letter of May 19th to the broker, and before the letter written on the 20th of May to the plaintiff, that he wanted the rice delivered alongside the Palatia, instead of on the Palatia, does not appear from the record, but as Connell was plaintiff's agent, and as the agent gave the plaintiff modified shipping instructions, it must be presumed the agent acted correctly, and in accordance with instructions given by defendant.

"As admitted by plaintiff in its brief, the plaintiff, without ever having received any shipping instructions from the defendant, decided to ship the rice in question to Europe, consigned to defendant. This also appears from the record, for delivery of the rice had been completed on May 20, 1931, the date the plaintiff drew a draft on the defendant for the purchase price of the rice, since the draft bears that date, and shows that receipts for delivery of the rice were attached to the draft. (See draft attached to petition. Also see A–4.) The broker's letter to the plaintiff was dated in New York on May 20, 1931, and probably did not reach the plaintiff until May 23, 1931. It is not likely that 500 bags of rice could have been delivered from Crowley to Lake Charles by truck in one day, so delivery must have been started at least one or more days before May 20, 1931.

"The draft of May 20, 1931, was forwarded for collection on May 23, 1931. (Nockton, Tr. 121.) When the draft was received by the defendant in New York, on May 26 or 27 (Tr. 111, 112), it was refused payment, because there was attached to the draft a dock receipt of Lykes Bros. Steamship Company, for shipment over that line, instead of a bill of lading of the North German Lloyd Line, showing shipment on the Palatia, as per instructions in defendant's letter of May 19. (Fieudenthal, Tr. 111; Nockton, Tr. 121, 122.)

"Fieudenthal, for the defendant, denied that he ever asked that this draft be returned in order that a proper bill of lading or dock receipt be attached, or that he consented thereto, and his evidence on this point is not contradicted. (Tr. 112.)

"On June 17, 1931, dock receipt, not bill of lading, from North German Lloyd, was attached with other necessary documents to the draft of May 20, 1931, and returned to the defendant who again refused to pay the draft (Tr. 123, 126), which was presented on June 24, 1931, because the rice was shipped on the Palatia contrary to later instructions of defendant. (Fieudenthal, Tr. 110.) The draft was marked returned for the reason the 'steamer or dock receipt and inspection certificate do not agree.' (Tr. 125.) Defendant's letter of June 30, 1931 (unmarked), written to the broker, gives two reasons for refusing draft dock receipt attached instead of bill of lading, and delivery on June 16 instead of May 31.

"The original Rice Millers' Association Certificate as to grade of the rice, which was attached to the draft when it was forwarded or presented to the defendant a second time, on June 24, 1931, showed the rice was to be loaded on the steamer Oakwood, a Lykes Bros. ship, and the dock receipt attached at this time to the draft showed the rice was to move on the Palatia. (Tr. 125.)

"Correct papers were attached to the draft on June 27, 1931, and again presented to the defendant, who refused payment because the rice was then on the high seas, contrary to his instructions. (Tr. 110.)

"It is important to note that the defendant requested the broker, Connell, to have the plaintiff draw a draft on the defendant, with a bill of lading attached, and in defendant's letter to the broker it was stated that the North German Lloyd Line would issue a bill of lading upon delivery of the rice. This the steamship line had agreed to do. (P–10.)

"Nockton testified that a bill of lading is not issued until goods are loaded on a ship. (Tr. 132.)

"The broker, in communicating these instructions to the plaintiff, specially mentioned that the draft was to have the bill of lading attached. (See carbon copy of broker's letter, unmarked.)

"The contract of sale sued on in this case provided that payment for the rice was to be made in New York, 'upon presentation of documents,' and the record clearly shows that

the parties contemplated that a bill of lading be one of the documents.

"The cases of Theophas Simon and Kaplan Rice Mill, Inc., Nos. 16139 and 16140, were tried with this case, under an agreement which provided that evidence offered in one case might be considered in the others, if applicable. The contracts sued on in the two cases mentioned provided for payment by draft, with bill of lading attached. The defendant in this case in ample time requested that bill of lading be attached to draft drawn on him. This request was authorized by the contract, it was the practice provided for in the other cases, and, of course, is common practice in the business world.

"The Palatia was scheduled to sail June 20, 1931 (Delahoussaye, Tr. 27), but actually sailed on June 24, 1931 (Bone, Tr. 27; Fieudenthal, Tr. 88, 89). The rice was loaded on the steamer on or before June 20, 1931, because a bill of lading was issued by the steamship line on that date, and a bill of lading is not issued until the goods are loaded. (Nockton, Tr. 132.)

■ "It thus appears that the defendant had no right to a bill of lading showing shipment over the North German Lloyd Line before the rice was loaded on a ship of that line, say about June 18 to 20th, and certainly no such bill of lading could have been attached to the draft of May 20, 1931. Defendant's refusal to pay this first draft because a bill of lading was not attached was not justified.

"When goods are delivered at the docks in Lake Charles, for shipment, a dock receipt is issued to the owner of the goods, by the steamship line by which the goods are to be transported, and said receipt provides for shipment over the steamship line named, in accordance with the terms of a bill of lading, which the steamship is to issue, and to the terms of which the owner agrees.

■ "As the defendant, according to the undisputed testimony in the record, was under no obligation to furnish shipping instructions prior to ten days before the last delivery date named in the contract, May 31, 1931, and as the defendant furnished these instructions twelve days before May 31, 1931, the plaintiff had no right to make a delivery some days before May 19, entering into an obligation which would be binding on the purchaser of the rice, that it would be shipped over a line selected by the seller, that is, the plaintiff (Tr. 112), and that the rice would be consigned to a destination chosen by the seller.

■ "Even though a delivery of the rice at the place specified, accompanied by evidence of full and complete ownership of the rice, such as a dock receipt, unlimited as to the place the rice is to be shipped, and as to the carrier to be used in its transportation, might transfer complete title between the parties, and might constitute such delivery as was contemplated by the contract, it must be held that a delivery of the rice under the conditions that the rice was to be transported to a place and on a steamship line selected by the seller was not contemplated by the parties, and was not one that the purchaser was obligated to accept.

■ "Where a contract provides for the delivery of goods f. a. s. Lake Charles, La., and the seller, without any warrant whatever, delivers the goods in Lake Charles before the purchaser was obligated to accept the goods, and, in addition to premature delivery, tenders a title to the goods which provides for shipping the goods to Europe on a particular steamship line, when neither the contract nor the purchaser called for any such shipment, the seller actually violated the contract, and was in such default as to put an end to the contract.

"A contract provided that the seller was to ship during the months of September or October, 60,000 pounds of beans, and that the plaintiff was to forward the bill of lading for the shipment to his own order, with instructions to notify the purchaser. On October 30, shipment was made, and bill of lading forwarded to order of the seller, with instructions to notify the seller. In failing to take out a bill of lading containing the agreed stipulation that the purchaser was to be notified, the Supreme Court held, in the case of Lundy v. S. Pfeifer & Co., 162 La. 355, 110 So. 556, that the seller had violated the terms of his contract, and that the forwarding on November 6 of a proper bill of lading, in accordance with the terms of the contract, was neither justification nor palliation of his violation of the 'unquestioned terms of the contract.'

■ "While the contract provided for delivery of the rice not later than May 31, 1931, at the buyer's option, it extended the time for delivery, in the letter of May 19, which provided for shipment on the steamer Palatia, which was scheduled to sail June 20, 1931, and actually sailed from Lake Charles on June 24, 1931. However, this extension was made prior to the time of plaintiff's attempted performance of the contract, and in no wise operated as a waiver of the breach, which defendant did not then know about. This at most was an extension of the time in which plaintiff had to make just one delivery. In other words, if, instead of trying to force defendant to ship this rice to Europe over a certain steamship line, and before defendant wanted the rice shipped, plaintiff had simply waited until June 23 or June 24, 1931, and then delivered the rice alongside the Palatia, it might, with some good conscience, have claimed it was making a delivery within an extended term of the contract.

"When the defendant refused to pay the draft on May 26, or 27, 1931, it said or did nothing that was calculated to lead the plain-

tiff to believe it might have a second chance to perform its contract, nor did the plaintiff indicate until June 24, 1931, the date the second draft reached the defendant, that it (the plaintiff) desired or intended to make a second effort to comply with its obligation.

"The plaintiff contended and proved that in May and June, 1931, the price of rice declined considerably. It follows from this that, if defendant is compelled to pay for this rice, the decline it sustained between May 19, 1931, and June 27, 1931, would fall on the defendant, who was in no wise responsible for the delay of over five weeks in the attempted delivery of the rice.

■ "A delay of over five weeks in the delivery of a commodity like rice, after a demand for delivery has been made, at a time when the market price is steadily falling, constitutes a violation of contract, such as to justify defendant's refusal to pay the purchase money.

"In the case of Monumental Brewing Company v. Southern Rice Milling Company, 155 La. 454, 99 So. 401, the Supreme Court held that under a contract for the purchase of two carloads of brewers' rice, 'shipment; buyer's option, January 1 to March 1, 1917,' the buyer could not recover damages for nondelivery of the rice where the buyer made no demand for the rice until after March 1, 1917. Since the buyer could not demand delivery after the time provided in the contract for delivery, it follows that the seller cannot make delivery after the time provided in the contract for delivery.

"In the case of Tanner v. Eagle Bag Co., 145 La. 502, 82 So. 682, the plaintiff purchased five carloads of bags, f. o. b. Sugarland, Tex., 'when shipped; during the month of August, 1914.' The seller, in the first part of August, began asking the buyer for shipping instructions, which were not received until August 17, 1914. Upon receipt of the request to ship, the defendant declared the contract at an end, and on August 31, 1914, changed its mind, and offered to make delivery of the bags in New Orleans, on the afternoon of that date. Without passing on the question as to the defendant's right to comply with the contract after having once refused, the Supreme Court held that an offer to deliver in New Orleans, although that was the place the plaintiff intended to have the bags delivered from Tex., was not a compliance with the contract.

"It is not sufficient answer to this finding to say that defendant had extended the delivery time of the contract to the time the Palatia sailed on June 24, 1931. Under the terms of the contract, defendant had the right to have the rice delivered on May 19, 1931, 'alongside the Palatia.' In fact, the rice was then on the Lake Charles docks, but not at the Palatia pier, and had it been at the place, and at the time defendant designated, as defendant had the right to designate, and had the rice been tendered with evidence of unconditional ownership, defendant might have sold the rice, or otherwise disposed of it without the loss which plaintiff's fault would cause, if defendant be made to pay for the rice.

■ "The delivery of the rice before defendant had exercised its right under the contract, and accompanied by dock receipt showing shipment was to be made to a place and on a ship not selected by the defendant, was not only a failure to deliver full title to the rice, but was an active violation of the contract. This sort of delivery was absolutely inconsistent with the contract, and put an end to it. Civ. Code, arts. 1931, 1932.

"This view of the case makes it unnecessary to consider defendant's claim that the rice was shipped contrary to instructions.

"For the foregoing reasons, the law and the evidence being in favor thereof:

"It is ordered, adjudged, and decreed that there be judgment herein, in favor of the defendant, rejecting the demands of the plaintiff at its cost, including fee of the curator ad hoc, Mark C. Pickrel, Esq., which is hereby fixed at $35.

"It is further ordered, adjudged, and decreed that there be judgment herein in favor of the intervener and third opponent, Carhart J. Martenis, decreeing that the rice attached in this suit, or the proceeds thereof, shall be delivered to the said intervener, to be held by him as pledge for the payment by the defendant of the note executed by the defendant on April 9, 1931, to the intervener, in the sum of $10,000."

After a most patient and careful reading of this record, we have been unable to find where the lower court has fallen into any error of fact in either of the three cases appealed from. We find also that he has correctly applied the law which governs in such cases.

In this case, as in the two companion cases, counsel for plaintiffs contend that the court should not have recognized the lien claimed by Martenis on the rice which had been seized under attachment. We find that the lien was properly recognized in favor of intervener, but, as plaintiffs' claims in damages in the three cases were properly denied, this issue as to the legality of the lien would be a matter of contest between defendant and intervener which is not urged by either of them either below or in this court.

Judgment affirmed.